THOMAS G. PRESBREY, Plaintiff-Appellee, *v.* THE GILLETTE COMPANY, Defendant-Appellant.

Second District   No. 81-501

Opinion filed May 5, 1982.

Robert S. Soderstrom, of McKenna, Storer, Rowe, White & Farrug, of Chicago (Shaun McParland, of counsel), for appellant.

Puckett, Barnett, Larson, Mickey, Wilson & Ochsenschlager, of Aurora (John R. Wienold and Bernard K. Weiler, of counsel), for appellee.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

A judgment in the amount of $23,750 was entered on a jury verdict in favor of Thomas G. Presbrey, the plaintiff, based upon his complaint that the use of Gillette Right Guard Extra Strength Anti-Perspirant caused a severe, persistent welting under his arms and on his chest together with a permanent inability to use all effective antiperspirants without a similar reaction. On appeal the defendant, The Gillette Company, contends that the judgment was against the manifest weight of the evidence, that prejudicial and reversible error prevented a fair trial, that verdicts should have been directed and alternatively that the verdict was excessive.

The plaintiff charged negligence in failure to sufficiently test the product, to warn of inherent dangers and to list and warn of the dangerous contents. There were additional counts based upon the theories of breach of express warranty and products liability. Essentially, the plaintiff's case relied upon the testimony of Dr. Bernard Szuhaj, a biochemist, who concluded that plaintiff became permanently sensitive to products containing aluminum complexes similar to the aluminum zirconium complex (which the Extra Strength Right Guard contained) as a result of inhaling particles of the defendant's aerosol spray product which created a systemic antigen-antibody reaction.

Dr. Bernard Szuhaj testified as a nontreating expert for the plaintiff. Before trial, Dr. Szuhaj was provided with certain documents from Gillette, the proposed regulation and the F.D.A.'s final ruling in the Federal Register, the formulation of aluminum-zirconyl hydroxychloride complex, particle size studies and defendant's Zirconium Anti-Perspirant. He testified that he had read the particle size studies which found that 40% of the particles were below two microns; he said further, however, that according to certain calculations, that 72% of the particles were under 5 microns, small enough to be trapped by the cilia (protective hairs) which line the upper respiratory tract, thereby allowing the particles to penetrate more deeply into the lungs.

Dr. Szuhaj said that from inhaling these particles one could sustain an antigen-antibody reaction. An antigen is the invading, foreign matter; an

antibody is produced by white blood cells as part of the immune response system to neutralize the antigen. The antibody couples with the antigen and covers it with a protective coating so that it can no longer irritate. As coupling occurs, a special chemical, histamine, is released as a consequence of which fluid enters the cells. The process surfaces finally in a welt or raised lesion.

On direct examination Dr. Szuhaj gave the opinion that the aluminum zirconium chloride complex was the operative antigen, without disclosing the basis for his opinion; on cross-examination, however, he said that he based his opinion on the results of a 90-day subacute inhalation test which Gillette had conducted on cynomolgus monkeys. It takes a repeated invasion of the aluminum zirconium chloride complex to build up a sensitivity reaction.

Dr. Szuhaj rendered his opinion based upon a hypothetical which contained the following facts as to which there was testimony in the record. A 15-year-old male with no previous allergies or other skin sensitivity had been using Right Guard Deodorant (brown can), and Right Guard Anti-Perspirant (silver can), on a daily basis since he was 12 years old without incident. In September 1973, he began using Gillette Anti-Perspirant Aerosol Spray (white can). After 2½ weeks' use on a daily basis he developed a severe itching, red, raw, welting irritation, not only in the axilla area, but down either arm and down both sides. He stopped using the product for one week and the condition gradually healed. Within 24 hours of his using the product again, the same condition of welting, redness and soreness occurred and upon cessation of use the healing occurred in the following week or so.

Over objection the witness gave his opinion:

"[T]hat the Zirconium-Aluminum Complex that we are looking at today is probable in the cause of the reaction that the 15-year-old individual found at that time. That's based on the immune response, the mechanism involved and detoxifying. * * *."

In the form of a hypothetical question, Dr. Szuhaj was asked to assume the following facts and then give his opinion to a reasonable degree of scientific certainty as to the cause of bronchiolitis in monkeys who were tested by Gillette in October of 1973 with aluminum zirconyl hydroxychloride complex (AZAP-74-30):

"(1) Six cynomolgus monkeys have been submitted to subacute inhalation testing for a ninety-day period.

(2) At the end of the ninety-day period, the monkeys were sacrificed and microscopic pictures were taken of sections of their lungs.

(3) The anti-perspirant contained particles, approximately 72% of which were under the five micron level.

(4) At the end of the ninety-day period, bronchiolitis was observed in the lungs."

Dr. Szuhaj was allowed to answer over objection that, based on the materials provided him through discovery, his expertise, and the professional literature on which he relied, that the lung inflammation indicated that "the immune process has already begun." Based on Gillette's test results, it was Szuhaj's opinion that there should have been further testing "to explore the possibility of sensitizing human subjects." He then stated that the same kind of sensitizing occurs in humans as occurred in the test monkeys. The antigen antibody reaction and later immunization is permanent and systemic—meaning that the antibodies circulate throughout the body. Significantly, this results in a raised lesion at the entry *or* the contact site of the antigen. He added that there is "more sensitizing" if the antigen is introduced topically.

Dr. Szuhaj was then asked to assume the additional facts that after the second eruption the individual used the Right Guard Anti-Perspirant in the silver can and the same eruption as from the white can occurred within 24 hours; then he used the deodorant in the brown can and encountered the same reaction. Asked whether within a reasonable degree of scientific certainty the use of the spray in the white can could be a causative factor of the new sensitivity to the other products and the subsequent eruptions, the witness answered "it is possible for this to be carried over to the other types of anti-perspirants, simply because we were talking initially about Aluminum-Zirconium. And the presence of Aluminum is the basis for other anti-perspirants. And Aluminum Complexes can also occur very similar to what we talked about with Zirconium."

On cross-examination Dr. Szuhaj testified that the presence of lesions in the plaintiff's lung could be verified only by an internal inspection through a "laparoscopic [*sic*][1]" examination, which was never performed on the plaintiff. Significantly, he explained that other people might not exhibit the plaintiff's sensitivity, because their production of antibodies upon the introduction of the antigens might not be high enough to elicit a response. Dr. Szuhaj testified that his opinion of etiology would not change if a patch test with a 20% solution of aluminum chlorhydrate was performed on the plaintiff and he exhibited a negative reaction; but he did not explain. He characterized his testimony on causation as "theory" or "hypothesis." He acknowledged that he had no formal training in

---

[1] "Laparoscopy" refers to an examination of the interior of the abdomen. (Dorland's Illustrated Medical Dictionary 836 (25th ed. 1974).) Dr. Szuhaj presumably meant a "bronchoscopic" examination, which refers to an examination of the interior of the bronchi. *Id.*, at 229.

dermatology or toxicology, and that he had never actually examined the plaintiff.

The trial court denied the defendant's later motion to strike Dr. Szuhaj's testimony.

Dr. Abraham Koransky, a dermatologist, performed various patch tests on the plaintiff. From the single patch test which he conducted on August 16, 1976, Dr. Koransky concluded that the plaintiff was permanently sensitive to an ingredient in Gillette's Extra Strength Anti-Perspirant. Dr. Koransky could not determine the sensitizing ingredient, nor could he determine from one patch test whether the plaintiff was permanently sensitive to other similar preparations.

On June 24, 1980, Dr. Koransky conducted six patch tests, the results of which are set forth below:

| Product | Result |
| --- | --- |
| Right Guard Deodorant (brown can) (def.'s exhibit No. 4) | 4+ |
| Right Guard Anti-Perspirant (silver can) (def.'s exhibit No. 11) | 1+ |
| Dry Idea (def.'s exhibit No. 5) | negative |
| Alamay Rx-Anti-perspirant (def.'s exhibit No. 8) | negative |
| Ar-Ex spray deodorant (def.'s exhibit No. 10) | 1+ |
| Aluminum chloride (20% solution) | negative |

Dr. Koransky concluded that the plaintiff was permanently sensitive only to the Right Guard in the brown can. He added that it would have been more desirable to test separately the individual ingredients contained in each deodorant product.

Dr. Koransky further said that the plaintiff's condition appeared to be epidermal, not dermal. Epidermal sensitivity is based on contact with the sensitizing matter, whereas dermal sensitivity is systemic following the ingestion or inhalation of matter to which the individual is sensitive. It was Dr. Koransky's opinion that the plaintiff's problem was "contact sensitivity."

Theodore Wernick, a toxicologist, testified for the defendant. He is chief compliance coordinator at Gillette Medical Evaluation Laboratories, and in 1973 was a medical review officer for Gillette, responsible for evaluating new products for compliance with government regulations and environmental standards. According to Wernick, before Gillette places a new product on the market, it is reviewed for safety by several

medical review officers. They review the medical literature in the field, reports of adverse reactions, reports on the product, ingredients, or individual chemicals which the product contains, testing information, and applicable government regulations. Prior to giving medical approval of Gillette's Right Guard Extra-Strength Anti-Perspirant, Gillette conducted various 14-day acute animal studies to determine the toxicity and level of irritation to the skin, eye, and lungs of laboratory mice and rabbits. Gillette also conducted 90-day subacute or subchronic animal tests to ascertain the toxicological effects, if any, following dermal application and inhalation. In addition, Gillette used human subjects in a 14-day skin patch test, to ascertain whether the product contained any primary irritants, and performed efficacy and consumer use studies. For the subacute inhalation test monkeys were supposed to be used; they were sick, however, and rabbits were used in their place. Wernick testified that rabbits were used because past experience had indicated that rabbits were comparable to monkeys. All tests, according to Wernick, were passed to Gillette's satisfaction.

Gillette marketed the product before tests on other monkeys were completed, which tests were begun in July 1973. The product was voluntarily recalled by Gillette on October 1, 1973, approximately one month after its initial distribution. The test data disclosed that the monkeys had microscopic lesions in their lungs, a condition similar to bronchitis (inflammation) or a bad cold. Wernick said that the condition was not a granuloma but was granulomatous, meaning that the lung tissue was behaving in a way similar and prior to the onset of a granuloma.

When Gillette recalled its product, it notified the F.D.A. and also submitted its data to the F.D.A. Over Gillette's objection, a portion of the F.D.A.'s final ruling, which was printed in the Federal Register, August 16, 1977, issue, was read into the record. That portion of the final ruling provides that aerosols containing zirconium are to be classified as a "new drug" and not generally recognized as safe and effective for use. The F.D.A.'s final ruling, which prevented the marketing of the Gillette product, applied to all aerosols containing zirconium complexes. The ruling did not apply to nonaerosols.

Before the F.D.A.'s final ruling of August 16, 1977, the notice of proposed rule-making appearing in the Federal Register of June 5, 1975, indicates that the manufacturer of another antiperspirant containing a zirconium complex, zirconium-aluminum glycine complex, had been asked by the F.D.A. to submit its complete complaint file. This file contains 249 complaints received from the introduction of the non-Gillette product in June of 1973 to October 1973. By comparison, in the approximately one month period during which Gillette marketed its zirconium product, Gillette acknowledged receipt of only one complaint. It was

Gillette policy, however, to destroy correspondence three years after the receipt. Presumably the 1973 files would have been destroyed by 1976, when the plaintiff filed his initial complaint.

Wernick noted that the F.D.A. did not find that aluminum zirconium complexes were sensitizers, because nonaerosols containing these complexes were unaffected by the F.D.A.'s final rule. Wernick added that the Gillette active ingredient, aluminum zirconyl hydroxychloride, was not a sensitizer but admitted that zirconium is an irritant and that, as part of the sodium zirconium lactate, it has caused granulomatous reactions.

Wernick also allowed that the production schedule and other marketing factors may have entered into his decision not to delay medical clearance before Gillette could evaluate the results on the 90-day subacute inhalation test on the test monkeys.

Wernick also testified that he was familiar with tests known as *in-vitro* studies which are conducted on living cells taken from the test subject. He stated that these studies could be performed on human cells and could serve as an indicator of the products response if it entered into the blood stream. Gillette conducted no such tests. Wernick also testified, however, that such tests are not generally used to predict responses.

Wernick was asked several hypothetical questions based on facts to which the plaintiff had testified, and to assume Dr. Koransky's patch test results. Wernick concluded that given the 1976 patch test the hypothetical subject of the test was permanently allergic to the Right Guard in the white can. Wernick gave the following opinion as to what the 1980 patch test results disclosed:

> (1) Right Guard Deodorant had a 4+ reaction. That would indicate that the subject had a sensitization or strong possible allergic type reaction to the type product of Right Guard Deodorant.
>
> (2) Right Guard Anti-Perspirant had a 1+ reaction. 1+ is a fairly mild reaction. It is not indicative of an allergic reaction.
>
> (3) Dry Idea Anti-Perspirant had a negative reaction. There is no possibility of allergic reaction.
>
> (4) Alamay Rx Anti-Perspirant had a negative reaction. Again, there is no possibility of allergic reaction or sensitivity.
>
> (5) Ar-Ex Spray Deodorant had a 1+ reaction, which is a very mild reaction and is not indicative of an allergy.
>
> (6) The 20% solution of aluminum chloride was a negative reaction which again indicated no allergic response.

Based on the patch test, Wernick's opinion to a reasonable degree of scientific certainty was that the subject was not permanently sensitive to zirconium. This opinion was based on the hypothetical subject's negative reaction to Dry Idea, an antiperspirant containing aluminum zirconium. He additionally testified that if the hypothetical subject had a permanent

sensitivity to all deodorants and antiperspirants containing aluminum chloride and its compounds, the subject's reaction to a test of 20% solution of aluminum chloride should have been positive rather than the actually reported negative.

Dr. Wernick stated that if particles less than 10 microns entered the lung the body could respond to the invasion in one of several ways: (1) the body could expel the foreign matter; (2) the particles could enter the blood stream and either be used by the body or be expelled through the kidneys; (3) the particles might not circulate and induce any response; (4) the white blood cells might destroy the particles without any antigen-antibody reaction; (5) a granuloma might form; or (6) an antigen-antibody reaction might occur. He added that an antigen-antibody reaction as Dr. Szuhaj described would be "extremely rare."

On cross-examination he agreed that once the antigen-antibody enters the blood stream it becomes systemic but again added that inhalation of a substance does not necessarily result in the formation of an antigen-antibody reaction.

Dr. Lester Hardy, president of Gillette Medical Evaluation Laboratories, who was responsible for all toxicology and safety evaluations at Gillette in 1973, testified that in one study 34% of the particles were less than 2 microns; in another 41% were less than 2 microns. He stated such studies are undertaken in part so that Gillette can properly evaluate animal inhalation data, but that Gillette's studies are greatly exaggerated over normal human exposure. He was aware that particles below 10 microns can penetrate the lower lungs in man.

Hardy added that Gillette began marketing a zirconium aerosol because Gillette research indicated that zirconium was 10% more effective in reducing wetness that simple aluminum chlorhydrate. He further testified that he was aware that zirconium in a lactate derivative of salt, sodium zirconium lactate, reportedly caused granulomas in people, but that the sodium zirconium was different from the aluminum zirconium hydroxychloride complex which was the active ingredient in the Gillette Right Guard Extra Strength Anti-Perspirant.

He testified that he approved the October 1, 1973, voluntary recall by Gillette of its antiperspirant based on the results of the 90-day subacute inhalation test in the monkeys. These results disclosed the formation of granulomatous lesions on the lungs of the test monkeys. He testified that if Gillette had known of these results it would not have marketed its zirconium aerosol.

Dr. Ronald Wise, a dermatologist, then testified. On December 30, 1978, he took a medical history and examined the plaintiff. According to the history which was then reduced to writing, the plaintiff complained of skin eruptions underneath his arms within 20 hours of initial contact with

the zirconium aerosol. After this initial experience, the plaintiff could no longer use other antiperspirants without eliciting similar skin eruptions. Plaintiff also disclosed that he was slightly allergic to penicillin, but claimed to be in good health otherwise.

The plaintiff told Dr. Wise that the sores would scab over following inflammation. According to Dr. Wise, this indicated that the plaintiff had eczematous dermatitis. From his examination he concluded that the plaintiff's response did not depend on circulating antibodies, which was contrary to Dr. Szuhaj's expert opinion, but rather was "cell-mediated" as is usually observed in eczematous dermatitis. Lymphocytes rather than circulating antibodies are sensitive to the invading antigen.

The front of the defendant's Zirconium Anti-Perspirant in the white can displays the following label:

"Gillette
RIGHT
GUARD
EXTRA STRENGTH
ANTI-PERSPIRANT

for problem
perspiration

NET WT. 8 OZ."

The back of the can reads:

"EXTRA STRENGTH
RIGHT
GUARD
ANTI-PERSPIRANT
DEODORANT

* Checks Problem Perspiration Better
* Stops Odor * Lasts All Day
* Anti-Stain—Fights Stains

This new formula's active ingredient is a combination of not just one but two anti-wetness agents. Goes on dry to keep you drier than any other leading spray. Made for people with more of a perspiration problem than others . . . PROBLEM PERSPIRATION

TO USE: Hold can six inches from underarm, point arrow and push down to spray. If unit fails to operate, rinse the spray button in warm water, resume use as normal.

CAUTION: Never spray toward face or open flame. Keep from extreme heat or cold. Do not puncture or incinerate can. Do not apply to broken skin—if rash develops discontinue use. Keep out of reach of children. Use only as directed. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal.

ACTIVE INGREDIENT: Aluminum-zirconyl Hydroxychloride complex."

The defendant's motion for directed verdict was denied, the jury returned a verdict for plaintiff in the sum of $23,750, and the trial court entered judgment thereon. The defendant's motion for judgment notwithstanding the verdict was denied and this appeal has followed.

From the record before us we conclude that the trial court erred in failing to enter a judgment *n.o.v.* in favor of Gillette and that this issue is dispositive of the appeal.

In the only Illinois case which appears to have addressed the issue of allergic or idiosyncratic reactions the court held that a seller of a garment is not liable to the consumer who suffers an allergic reaction if the product contains no defect or ingredient which would cause harm to the "average" person. *Stanton v. Sears Roebuck & Co.* (1942), 312 Ill. App. 496, 500-01.

The unusual susceptibility of the consumer is generally recognized as a complete defense where the manufacturer did not know and had no reason to know that a very few users of his product might be injured. (See generally Prosser, Torts §96 (4th ed. 1971); Annot., 53 A.L.R.3d 298 (1973); Comment, *Strict Liability and Allergic Drug Reaction*, 47 Miss. L.J. 526, 527 (1976).) The cases collected adopt the view that if the product does not threaten severe harm to the ordinary consumer, then it is reasonably fit for the purpose for which it is sold. The benefit to the mass public who use the product is said to outweigh the harm suffered by the insignificant few. *(Kaempfe v. Lehn & Fink Products Corp.* (1964), 21 App. Div. 2d 197, 201-02, 249 N.Y.S.2d 840, 846; *Thomas v. Gillette Co.* (La. App. 1970), 230 So. 2d 870, 874-75; *Bonowski v. Revlon, Inc.* (1959), 251 Iowa 141, 145-47, 100 N.W.2d 5, 7-9.) The proximate cause of injury is attributed to the idiosyncrasy or allergy of the plaintiff and not to a failure to warn of a defect in the product. *Howard v. Avon Products, Inc.* (1964), 155 Colo. 444, 455, 395 P.2d 1007, 1012.

The courts have variously formulated the requirement that the consumer not be unusually susceptible to injury. *Stanton* appears to be in line with the majority view that speaks of the "normal," "average" or "ordinary" consumer who, presumably, is not idiosyncratic. (3 Frumer & Friedman, Products Liability sec. 29.03(1) (1981).) Other courts elsewhere have said that a particular plaintiff is not idiosyncratic where a "small proportion" *(Zirpola v. Adam Hat Stores, Inc.* (1939), 122 N.J.L. 21, 4

A.2d 73; *Reynolds v. Sunray Drug Co.* (1947), 135 N.J.L. 475, 52 A.2d 666) or "some persons" (*Bianchi v. Denholm & McKay Co.* (1939), 302 Mass. 469, 19 N.E.2d 697) or an "identifiable" class (*Howard v. Avon Products, Inc.* (1964), 155 Colo. 444, 395 P.2d 1007), or an "appreciable" number (*Casagrande v. F. W. Woolworth Co.* (1960), 340 Mass. 552, 165 N.E.2d 109), or "a substantial" number of persons suffer injury. (*Grau v. Procter & Gamble Co.* (5th Cir. 1963), 324 F.2d 309 (applying Alabama law); *Magee v. Wyeth Laboratories, Inc.* (1963), 214 Cal. App. 2d 340, 29 Cal. ` Rptr. 322.) We find most persuasive comment j to section 402A of the Second Restatement of Torts which provides, in effect, that where a product contains an ingredient to which a substantial number of the population is allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has actual or constructive knowledge thereof. Illinois law recognizes a cause of action for strict liability coinciding with the position taken by section 402A. *Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 30-33; *Gallee v. Sears, Roebuck & Co.* (1978), 58 Ill. App. 3d 501, 503.

The rule barring the idiosyncratic consumer from recovery generally applies whether suit is brought under strict liability, breach of warranty, or negligence. (Prosser, Torts, secs. 96, 102 (4th ed. 1971).) Regardless of the plaintiff's theory, the manufacturer owes no prior duty to warn of a risk that is remotely possible to the unknown few in the population. (*Kaempfe v. Lehn & Fink Products Corp.* (1964), 21 App. Div. 2d 197, 201, 249 N.Y.S.2d 840, 845.) The rule of nonliability has been relaxed, however, where the suit has not concerned an over-the-counter product, like an antiperspirant, but involved a drug or vaccine with dangerous propensities. (See *Tomer v. American Home Products Corp.* (1976), 170 Conn. 681, 690, 368 A.2d 35, 40; *Davis v. Wyeth Laboratories, Inc.* (9th Cir. 1968), 399 F.2d 121, 130; *Sterling Drug, Inc. v. Cornish* (8th Cir. 1966), 370 F.2d 82, 85.) These cases have rejected any exclusively quantitative standard in measuring the manufacturer's duty, and look instead to the overall danger.

■■ It is clear that the use of the Gillette Right Guard Extra Strength Anti-Perspirant (Extra Strength) caused an injurious reaction to the plaintiff. We conclude, however, that the evidence has failed to show that Gillette's Extra Strength contained an ingredient to which a substantial number of the population is allergic. The aluminum zirconyl hydroxychloride complex in Extra Strength is not a primary irritant. There was nothing in the premarketing testing by Gillette to show that the product contained any ingredient which was injurious to a number of people. There was unimpeached testimony that the zirconium complex in the

Extra Strength is not a known sensitizer; in fact, nonaerosols containing zirconium were unaffected by the F.D.A.'s final ruling. Evidence that the product's ingredients were not known sensitizers or irritants in itself was sufficient to overcome any otherwise applicable presumption of plaintiff's "normality" (see *Casagrande v. F. W. Woolworth Co.* (1960), 340 Mass. 552, 556, 165 N.E.2d 109, 112), and once Gillette carried the burden of going forward with this evidence, the jury could not infer that the product could permanently sensitize "normal" users from plaintiff's testimony that he had not manifested sensitivity before using defendant's product. (*Kaempfe v. Lehn & Fink Products Corp.* (1964), 21 App. Div. 2d 197, 201-02, 249 N.Y.S.2d 840, 846; *Mountain v. Procter & Gamble Co.* (E.D. Wis. 1970), 312 F. Supp. 534, 537; *cf. Newmark v. Gimbel's Inc.* (1969), 54 N.J. 585, 598-99, 258 A.2d 697, 704.) Moreover, plaintiff's expert witness' testimony did not suggest that any number of potential users might develop plaintiff's sensitivity from inhaling zirconium particles. The 90-day subacute inhalation test on six test monkeys did not lead to the inference that a substantial number of users might become permanently sensitized, but only indicated, as Dr. Szuhaj testified, that further research was warranted "to explore the *possibility* of sensitizing human subjects." (Emphasis added.) Dr. Szuhaj testified that inhaling the antigen would induce an antibody response in people, but said further that different people would have different degrees of "reactivity." Against Dr. Szuhaj's theory, Wernick listed five ways in which the body could react in addition to an antigen-antibody response, which he characterized as "extremely rare." Dr. Szuhaj's testimony aside, there was no other evidence to link plaintiff's sensitivity with the inhalation of airborne particles.

Further, there was no proof to sustain plaintiff's allegation that use of the Gillette product caused plaintiff to become permanently sensitive to all other antiperspirants containing aluminum complexes. Dr. Koransky testified that plaintiff was permanently sensitive to some ingredient in the "Extra Strength" but could not determine the sensitizing ingredient. From his patch tests he concluded that plaintiff was permanently sensitive to another Gillette product, Right Guard Deodorant (brown can), but not to various other antiperspirants or to a 20% solution of aluminum chloride.

Based on these patch tests, Wernick concluded that the hypothetical plaintiff was not permanently sensitive to zirconium. This opinion was based on plaintiff's negative reaction to Dry-Idea, an antiperspirant containing an aluminum zirconium complex. Also, he noted that if the subject had a permanent sensitivity to all deodorants and antiperspirants containing aluminum complexes, the reaction to the 20% aluminum chloride solution should have been positive rather than negative as reported. Dr. Szuhaj could not explain these observed negative reactions.
■■ We conclude from the entire evidence that it is at least equally

inferable, based on Dr. Koransky's patch tests, that plaintiff is not permanently sensitive to other products containing aluminum complexes, contrary to Dr. Szuhaj's conclusion. A fact cannot be inferred from the evidence when the existence of another fact inconsistent with the first can be inferred with equal certainty from the same evidence. See *Lewis v. Mount Greenwood Bank* (1980), 91 Ill. App. 3d 481, 486-87.

We recognize that the rule of nonliability has been relaxed by some courts where the defendant has breached an express warranty of safety to the ultimate consumer. (See cases collected in 63 Am. Jur. 2d *Products Liability* sec. 202 n.90 (1972).) Count II, alleging such a theory, is not supported by the evidence. The label did not promise complete safety; to the contrary, the instructions on the label directed that the consumer should discontinue use if a rash developed. Further, the "advertisements" to which plaintiff referred in count II of his amended complaint were never introduced in evidence. The mere listing of some ingredient in itself does not constitute a basis for an action in warranty. See *Zampino v. Colgate-Palmolive Co.* (1959), 8 App. Div. 2d 304, 306, 187 N.Y.S.2d 25, 27, *appeal dismissed* (1960), 7 N.Y.2d 995, 199 N.Y.S.2d 508.

■■ From our review of the entire record, we conclude that the evidence so overwhelmingly favors defendant that no contrary verdict for plaintiff could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) Here, two examining dermatologists, Dr. Koransky and Dr. Wise, agreed that plaintiff's observed sensitivity was not caused by circulating antibodies, but was epidermal, that is, based on contact sensitivity; also, there was uncontradicted testimony that the body could react in at least five ways inconsistent with an antigen-antibody response and that any such response was extremely rare. And, as noted earlier, plaintiff's reaction to compounds containing aluminum was negative. A fact cannot be circumstantially established unless the circumstances are of a nature and so closely related that the conclusion offered is the only one that can be drawn; conjecture, guesswork, or suspicion are insufficient. (See *Upgrade Corp. v. Michigan Carton Co.* (1981), 97 Ill. App. 3d 1132, 1136; *Lewis v. Mount Greenwood Bank* (1980), 91 Ill. App. 3d 481, 486.) Dr. Szuhaj's theory of etiology was too conjectural to withstand defendant's post-trial motion for judgment *n.o.v.*

In this view of the case we do not reach other claims of trial error of which Gillette complains.

The judgment is reversed and the cause remanded to the trial court with directions to grant Gillette's post-trial motion for judgment *n.o.v.* and to enter judgment in favor of the defendant.

Reversed and remanded with directions.

UNVERZAGT and VAN DEUSEN, JJ., concur.