CARY GOLDMAN, Plaintiff-Appellee, v. WALCO TOOL AND ENGINEERING COMPANY, Defendant-Appellant.

First District (1st Division)   No. 1—91—1282

Opinion filed February 8, 1993.—Rehearing denied May 25, 1993.

Keevers & Hittle, of Chicago (Joseph P. Postel, of counsel), for appellant.

Duane Donahue, of Cary, for appellee.

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, Cary Goldman, brought this action in negligence, strict products liability and failure to warn against Walco Tool and Engineering Company (Walco), to recover for injuries he sustained as a result of his contact with Mobilarma 245, a rust-preventive oil manufactured by the Mobil Oil Company. A jury trial commenced on the issue of strict liability on September 24, 1990. Following trial, the jury returned a verdict in favor of plaintiff, awarding him a total of $589,278.70 in itemized damages, including $297,484.90 for past and future loss of earnings. On appeal, defendant contends that: (1) the statute of limitations defense was not waived, despite defendant's failure to separately plead the statute of limitations as an affirmative defense; (2) the evidence at trial was insufficient to support the jury verdict on the issues of causation, idiosyncrasy and notice; (3) the trial court erred in admitting the warning label into evidence; and (4) the jury's award of damages for post-1983 and future loss of earnings was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

The record discloses the following relevant facts. Plaintiff filed his complaint on May 18, 1982. Plaintiff subsequently voluntarily dismissed the action and refiled the action on October 26, 1984. On October 30, 1989, plaintiff filed his amended complaint. In paragraph 9 of the complaint, plaintiff alleged that he first discovered his injury after June 1, 1980, and brought his action within two years of that date. Defendant filed an answer to plaintiff's amended complaint, denying the allegations generally, and raising as the sole affirmative defense that plaintiff's reaction to Mobilarma 245 was idiosyncratic and "not the type of reaction any significant number of the general population would have had to Mobilarma 245."

Prior to trial, defendant moved *in limine* to exclude from evidence any reference to warnings placed by the manufacturer, Mobil Oil Company, on the 55-gallon drums in which it shipped Mobilarma 245 to defendant. The trial court denied defendant's motion.

At trial, plaintiff testified that in 1979, he was employed as a parts inspector by Caterpillar Tractor Company (Caterpillar) in Montgomery, Illinois. In September of that year,[1] plaintiff inspected

---

[1]The complaint states that the incident occurred on August 30, 1979; however, plaintiff indicated at trial that the incident occurred sometime in mid-September 1979.

a tractor part called a junction block which was coated in Mobilarma 245. During the inspection, plaintiff reached into a plastic bag which contained the junction block, immersing his hands in the Mobilarma 245. Plaintiff continually wiped his hands with a cloth while he inspected the junction block. Within 30 minutes, plaintiff developed a rash on his hands.

Plaintiff told his co-workers that he was experiencing a reaction to the Mobilarma 245, and advised them to avoid contact with the oil. Later that day, plaintiff noticed that the rash had spread all over his body. During the next week, plaintiff's hands became swollen, and he developed other symptoms including dizziness and swollen legs and feet, which interfered with his ability to walk, and prevented him from doing his job properly.

Plaintiff sought medical treatment from Dr. Mustafa Vidinli and was hospitalized for a week. Dr. Vidinli diagnosed plaintiff as suffering from chronic angioedema and urticaria, and prescribed medication. When plaintiff returned to work after a few months, he had a great deal of difficulty doing his usual tasks, and was limited as to which tasks he could perform because of his condition. Dr. Vidinli testified that plaintiff had to avoid chemical solvents, stairs and ladders, scaffolds, dust, gas, fumes, extreme temperature changes, damp areas, cramped or unusual positions, pushing and pulling and twisting arms and legs, grasping, handling, repetitive movement of hands and feet, climbing of stairs and balances, exposure to falling, and operating heavy equipment. Plaintiff was transferred to another jobsite, and at some point in 1980 plaintiff was forced to take a medical leave of absence from Caterpillar.

In 1982 or 1983, plaintiff applied for reinstatement at Caterpillar and was denied a position in the factory because of his medical limitations. In 1983, Caterpillar placed plaintiff's name on a waiting list for an office job, but as of the time of the trial, plaintiff had not been reinstated in any position at Caterpillar.

Plaintiff called David Walsh, president of Walco, to testify as an adverse witness. Walco is the manufacturer of tractor parts, including junction blocks. Walsh testified that Walco shipped junction blocks to Caterpillar, prior to the end of August 1979. Walsh stated that Walco received Mobilarma 245 from the Mobil Oil Company in 55-gallon drums, and that warning labels were affixed to the drums. Prior to shipping to Caterpillar, the junction blocks were put into plastic bags, coated with Mobilarma 245, and sealed. The sealed bags were then placed in cardboard boxes bearing Walco's name. The warning label that appeared on the barrels of Mobilarma 245

did not appear on the boxes in which Walco shipped the junction blocks.

Plaintiff's counsel then published the following warning label from a 55-gallon drum of Mobilarma 245 to the jury, as stipulated by the parties:

"PETROLEUM DISTILLATE
DANGER!
COMBUSTIBLE MIXTURE HARMFUL OR FATAL IF SWALLOWED
KEEP AWAY FROM HEAT AND OPEN FLAME. USE ONLY
WITH ADEQUATE VENTILATION.
AVOID PROLONGED OR REPEATED SKIN CONTACT.
AVOID PROLONGED BREATHING OF MIST OR VAPOR.
IF SWALLOWED, DO NOT INDUCE VOMITING.
CALL PHYSICIAN IMMEDIATELY.
KEEP OUT OF REACH OF CHILDREN."

Defendant reserved its objection to the label's relevance.

Dr. Jerrold B. Leikin testified as an expert witness on behalf of the plaintiff. Dr. Leikin is board certified in internal medicine, emergency medicine and medical toxicology, and is a teaching associate in internal medicine at several Chicago-area hospitals. Dr. Leikin testified that he reviewed plaintiff's medical records, and in his opinion, plaintiff's exposure to Mobilarma 245 caused plaintiff to suffer from a variety of illnesses, including urticaria, the sudden onset of the swelling and inflammation of the skin, and angioedema, an internal swelling and inflammation in the respiratory tract or the gastrointestinal tract. He stated that one of plaintiff's symptoms, an injected pharynx (a throat tightness), was a manifestation of the angioedema, and that plaintiff's symptoms of a rash, purple spots, and tender and swollen feet were the result of contact with Mobilarma 245.

Dr. Leikin reviewed the "Material Safety Data Sheet" (MSDS) for Mobilarma 245, a document the chemical manufacturer is required by Federal law to provide to the seller of the chemicals along with its product. The MSDS provides a description of the product in terms of health hazards, safety requirements, and directions for disposal. The MSDS described Mobilarma 245 as containing three components: petroleum naptha, sulfonic acid, and surfactant. Dr. Leikin described surfactant as a non-water-soluble material which acts as an agent against rust, repelling water. He stated that the chemical constituents in Mobilarma 245 can get into

the body by absorption through the skin or through inhalation, and that there is some irritant effect. Dr. Leikin testified that plaintiff's exposure to Mobilarma 245 caused his skin to become dermographic, a condition whereby pressure on the skin creates a welt surrounded by an area of redness. Dr. Leikin stated that several months before trial, he treated a patient who exhibited symptoms similar to the plaintiff's, and that the patient had been exposed to agents similar to the ones contained in Mobilarma 245. In his opinion, it is not safe to handle parts coated in Mobilarma 245 with your bare hands. Dr. Leikin further testified that in his opinion, prior to September 1979, plaintiff was not an atopic individual, a person who is prone to adverse allergic manifestations due to many environmental or medicinal objects or substances.

On cross-examination, Dr. Leikin stated that the palms of the hand are much less absorbent than the back of the hands because the skin on the palms is rougher. He stated that it was possible that plaintiff's dizziness, sleeplessness and epigastric pain were not caused by overexposure to Mobilarma 245, but that patients with angioedema are known to experience such adverse symptoms. He indicated that petroleum naptha (distillates), one of the ingredients of Mobilarma 245, can also be found in gasoline, lighter fluid, kerosenes, turpentine, rust remover, and some laundry detergents. He testified that he knows of scientific studies wherein brief exposures to some of the compounds in Mobilarma 245 have resulted in symptoms similar to those experienced by the plaintiff. Dr. Leikin stated that plaintiff could continue to have symptoms absent any reexposure to Mobilarma 245.

Al Weygand, chairman of the bargaining committee for the United Auto Workers Local at Caterpillar, testified regarding the rates of pay for plaintiff's job classification at Caterpillar. Weygand testified that as of September 1979 plaintiff's income level was $9.86 per hour. In May 1983 that rate of pay was increased by 3% for plaintiff's job classification. In October 1986 the rate of pay was increased again by 3%, and the classification also received a 3% bonus for 1988. The rate of pay for plaintiff's job classification in 1988 was $15.51 per hour. As of the time of trial, the rate of pay was $16.85 per hour. In closing argument, plaintiff's attorney requested an award of $238,517.90 for lost wages from September 1979 through the date of trial. At the close of plaintiff's case, the court denied defendant's motion for directed verdict.

John Paul Bederka, a consultant in toxicology, testified as an expert witness for defendant. Bederka holds degrees in chemistry

and organic chemistry, and a Ph.D. in pharmacology. Bederka testified that he reviewed plaintiff's medical records, the MSDS sheets, and laboratory test results of Mobilarma 245.

Bederka stated that the MSDS sheets revealed that Mobilarma 245, in its original formulation, is a volatile liquid composed of 74% petroleum distillate, a substance found in household pesticide spray cans. He stated that by the time the product is applied to the materials that are shipped out, generally this volatile material has evaporated. What is then left of the product is essentially mineral oil, which constitutes 65% or 70% of the final product, which has very little tendency to evaporate. The likelihood of being able to breathe any amount of the product is extremely slim to nonexistent. Therefore, in Bederka's opinion, plaintiff did not inhale any significant amount of Mobilarma 245.

Bederka also testified that Mobilarma 245, in its original formulation, was subjected to laboratory testing on rabbits for eye and skin irritation. In the first test, small drops of the product were placed directly into the rabbits' eyes. The results were that there was no irritation effect at all on the rabbits' eyes. The product was also tested on the rabbits' skin. The results showed that the rabbits experienced a mild irritation 24 hours after testing. The results of the tests indicated that the product was a mild irritant.

Based on the rabbit test results, Bederka opined that plaintiff absorbed little or no Mobilarma 245 through his skin, because he was only in contact with the product for 30 minutes, far less exposure than the 24-hour period in which the rabbits were exposed to Mobilarma 245. Bederka further stated the skin on the palm of the hand is very thick, and the molecules in mineral oil are large and don't penetrate the skin very easily. He stated that the product as originally formulated before evaporation would penetrate the skin, but that once that solvent is gone, the product has little or no tendency to penetrate the skin.

Bederka further opined that the plaintiff's reaction to Mobilarma 245 was idiosyncratic. His opinion was based on the fact that nothing in the literature he reviewed described any kind of severe and prolonged illnesses such as that experienced by the plaintiff after exposure to Mobilarma 245.

Finally, Bederka stated that based on his review of plaintiff's medical records, the plaintiff's medical problems are ongoing and genetic. Bederka stated that the plaintiff had experienced allergies and hives at various times between 1967 and 1977, and that in between those times, plaintiff had been treated for gout, an abnormal

metabolism of certain types of chemicals that are inherently present in the body.

On cross-examination, Dr. Bederka testified that his opinion that plaintiff did not inhale the Mobilarma 245 was based on the assumption that the petroleum distillates had all entirely evaporated prior to plaintiff's exposure. He admitted, however, that the vapor could be inhaled. He further admitted that the inhalation of a petroleum distillate such as naptha can cause inebriation and even death, and that surfactants can cause membrane tissue destruction. He stated that if you can smell something, you can inhale it. Bederka further admitted that if the Mobilarma 245 is shipped in a sealed container the petroleum distillates will not evaporate, and that the type of packaging will affect whether or not the petroleum distillates evaporate. Bederka further testified that his opinion that the Mobilarma 245 was not absorbed through plaintiff's skin was based on the assumption that plaintiff's contact with the Mobilarma 245 was primarily through the palm of his hand. He further stated that the MSDS sheets contain a page with a precautionary label regarding avoiding prolonged skin contact and avoiding prolonged breathing of the vapor of the Mobilarma 245. Bederka admitted that he is not a medical doctor and does not make diagnoses for patients.

Next, Dr. Ronald Wolfson testified on defendant's behalf. Dr. Wolfson examined plaintiff on two occasions in 1988 and performed allergy skin testing on the plaintiff. Dr. Wolfson diagnosed plaintiff as suffering from allergic urticaria, a type of skin hive. He stated that plaintiff's exposure to Mobilarma 245 was in no physical way related to his complained-of symptoms. He stated that because of plaintiff's allergies, his hives could be triggered by exposure to strawberries, chocolate, and detergent. In his opinion, plaintiff had a genetic predisposition to allergies prior to his exposure to Mobilarma 245.

David Walsh then testified on defendant's behalf. Walsh testified that his company started using Mobilarma 245 in 1975 to coat parts for shipping. Since that time, approximately 250 employees handled the Mobilarma 245 without any complaints of adverse reactions, with the exception of the plaintiff. Walsh produced a steel block coated in Mobilarma 245 which was contained in a closed plastic bag. The bag was opened with a pair of scissors. Walsh removed the block from the bag. On cross-examination, Walsh testified that he could smell the Mobilarma 245 once the bag was opened. Defendant then rested its case.

Following closing arguments, the jury entered a verdict in favor of plaintiff and awarded him $589,278.70 in itemized damages, $297,484.90 for loss of earnings. The jury answered "no" to the following special interrogatory: "Do you find that Cary Goldman was unusually susceptible to Mobilarma 245 and that the risk of the injury he suffered was remotely possible only to the unknown few in the population?" The trial judge entered judgment on the verdict and subsequently denied defendant's post-trial motions to set aside the jury's verdict and enter judgment notwithstanding the verdict. Defendant's timely appeal followed.

Initially, defendant contends that the trial court erred in not finding that plaintiff's action was barred by the statute of limitations. Defendant argues that the two-year period specified in section 13—202 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—202) is the applicable limitations period and that plaintiff's action was not timely filed within two years.

The statute of limitations is an affirmative defense which must be pleaded and proved by a defendant. (*Ruddock v. First National Bank* (1990), 201 Ill. App. 3d 907, 918, 559 N.E.2d 483; *Findley v. Posway* (1983), 118 Ill. App. 3d 824, 827, 455 N.E.2d 861.) The facts constituting any affirmative defense must be plainly set forth in the answer or reply to a complaint, so as to give color to the opposing party's claim and assert a new matter by which the apparent right is defeated. (*Shute v. Chambers* (1986), 142 Ill. App. 3d 948, 951-52, 492 N.E.2d 528; Ill. Rev. Stat. 1989, ch. 110, par. 2—613(d).) Failure to specifically plead the statute of limitations provision constitutes a waiver of the defense. *Ruddock*, 201 Ill. App. 3d at 918.

In the present case, plaintiff alleged in his amended complaint that he first discovered his injury after June 1, 1980. Defendant filed an answer to plaintiff's amended complaint generally denying plaintiff's allegations and specifically raising an affirmative defense of idiosyncratic reaction under the caption "Affirmative Defense." Defendant never moved to amend its pleadings for the purpose of raising the statute of limitations as an affirmative defense. The trial court found that defendant's failure to specifically plead the statute of limitations as an affirmative defense constituted a waiver of the defense, especially in light of the fact that the affirmative defense of idiosyncratic reaction was "outstandingly pleaded."

■ Defendant's reliance on *Fitzpatrick v. City of Chicago* (1986), 112 Ill. 2d 211, 492 N.E.2d 1292, is misplaced. There, the court upheld the defendant's affirmative defense, noting that

defendant included a pleading entitled "Affirmative Defense" in its answer to plaintiff's complaint. In the present case, defendant raised no such affirmative defense regarding the statute of limitations. As such, defendant has failed to show that the trial court erred in denying its motion for new trial based on plaintiff's alleged failure to comply with the statute of limitations.

Next, defendant contends that the evidence at trial was insufficient to support the jury verdict on the issues of causation, idiosyncrasy and notice.

First, defendant argues that plaintiff failed to prove that the Mobilarma 245 caused plaintiff's injury. In support, defendant relies on *Sutton v. Washington Rubber Parts & Supply Co.* (1988), 176 Ill. App. 3d 85, 530 N.E.2d 1055, and *Mateika v. La Salle Thermogas Co.* (1981), 94 Ill. App. 3d 506, 418 N.E.2d 503; both cases are distinguishable from the present case on the facts. In *Sutton*, a products liability case, the court granted summary judgment in favor of defendant because the plaintiff could not provide a link between a light bulb that exploded and injured him and its alleged manufacturer. In *Mateika*, the plaintiff failed to produce any evidence supporting his allegation that a locking device should have been used to prevent the nut on a valve of a liquid propane gas tank from coming loose. *Mateika*, 94 Ill. App. 3d at 509.

The testimony of a medical expert is sufficient to prove a causal link between a plaintiff's injury and the source of his injury. (*Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 458 N.E.2d 1331.) In the present case, plaintiff's expert witness, Dr. Leikin, testified that plaintiff's symptoms were caused by his exposure to Mobilarma 245, and resulted in plaintiff's conditions of urticaria, angioedema, and dermographic skin. We find this expert testimony sufficient to prove a causal link.

Next, defendant argues that the evidence at trial proved that plaintiff's reaction to Mobilarma 245 was idiosyncratic and unique and, therefore, plaintiff's action was barred. Defendant argues that plaintiff's reaction to Mobilarma 245 was idiosyncratic based on the results of the rabbit tests. Defendant further argues that the evidence shows that other employees handled the oil without adverse reactions. In support, defendant relies on *Presbrey v. Gillette Co.* (1982), 105 Ill. App. 3d 1082, 435 N.E.2d 513. There, the court reversed judgment in favor of the plaintiff, who experienced a severe reaction after using defendant's anti-perspirant. The court found the plaintiff's reaction "idiosyncratic," that is, the plaintiff was un-

usually susceptible to injury caused by the use of the anti-perspirant. The court stated:

> "The unusual susceptibility of the consumer is generally recognized as a complete defense where the manufacturer did not know and had no reason to know that a very few users of his product might be injured. *** [I]f the product does not threaten severe harm to the ordinary consumer, then it is reasonably fit for the purpose for which it is sold." (*Presbrey*, 105 Ill. App. 3d at 1091, 435 N.E.2d at 520.)

The *Presbrey* court continued:

> "The rule of nonliability has been relaxed, however, where the suit has not concerned an over-the-counter product, like an anti-perspirant, but involved a drug or vaccine with dangerous propensities." *Presbrey*, 105 Ill. App. 3d at 1092.

*Presbrey* is distinguishable from the present case. Here, Mobilarma 245 is not an over-the-counter consumer product, but a chemical with dangerous propensities. Therefore, the rule of nonliability is relaxed. However, even if the *Presbrey* rule applies, the evidence at trial disclosed that it is not uncommon for individuals exposed to the compounds contained in Mobilarma 245 to have similar reactions. Dr. Leikin testified that scientific studies show that brief exposures to some of the compounds in Mobilarma 245 have resulted in symptoms similar to those experienced by the plaintiff. Dr. Leikin further testified that he treated a patient who exhibited symptoms similar to the plaintiff's, and that the patient had been exposed to agents similar to the ones contained in Mobilarma 245. We find defendant's arguments inconclusive to warrant setting aside the jury verdict.

Moreover, defendant's contention that it had no reason to know that the Mobilarma 245 had dangerous propensities is without merit. The record discloses that the 55-gallon drums containing Mobilarma 245 bore a label warning against, *inter alia*, "prolonged or repeated skin contact" and "prolonged breathing of mist or vapor." The record indicates that defendant received the drums with this warning, but did not include the warning on boxes in which it shipped parts coated with the Mobilarma 245 to Caterpillar. It is clear that defendant had notice of the dangerous propensities of Mobilarma 245.

■ Next, defendant contends that the warning label from the 55-gallon drum of Mobilarma 245 was improperly admitted into evidence at trial. Defendant argues that the warning label is irrelevant to the present case because it specified only that "prolonged" expo-

sure was dangerous, and plaintiff's exposure to Mobilarma 245 was not "prolonged." Defendant has waived this issue for review, having failed to cite any authority in support of its argument. *In re Marriage of Olbrecht* (1992), 232 Ill. App. 3d 358, 597 N.E.2d 635.

Nevertheless, a duty to warn of a product's dangerous propensities is imposed upon a manufacturer or supplier where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given. (*Oberg v. Advance Transformer Co.* (1991), 210 Ill. App. 3d 246, 569 N.E.2d 50.) The record shows that defendant was aware of the dangerous propensities of Mobilarma 245 and that it failed to include warnings when it shipped the product to Caterpillar. The warning label was therefore relevant to establish that defendant knew that the Mobilarma 245 had dangerous propensities.

Finally, defendant contends that the jury's award of $232,984.73 in damages to plaintiff for loss of earnings after 1983 was against the manifest weight of the evidence. Defendant argues that the evidence proved that plaintiff was able to return to work by the end of 1983; therefore, no basis existed for awarding him damages for loss of earnings thereafter.

In order to recover for lost earnings, all the law requires is that the plaintiff present evidence which will establish with a fair degree of probability a basis for the assessment of damages. (*Tracy v. Village of Lombard* (1983), 116 Ill. App. 3d 563, 575, 451 N.E.2d 992.) In that case, the court found testimony of an employer that he would have hired the plaintiff but for his disability, and plaintiff's estimation of the profit margin, sufficient evidence to recover for lost earnings. *Tracy*, 116 Ill. App. 3d at 575, 451 N.E.2d at 1001.

Defendant relies on *Brown v. Chicago & North Western Transportation Co.* (1987), 162 Ill. App. 3d 926, 516 N.E.2d 320, for the proposition that in order to recover for future lost earning capacity, the plaintiff must show that the future loss is "reasonably certain to occur." In fact, the proper language used by the court is whether such damages "would endure" in the future. (*Brown*, 162 Ill. App. 3d at 936.) In *Brown*, the plaintiff was injured when a hammer fell onto his back during the course of his employment with defendant. The court found that the evidence at trial indicated that the plaintiff did not suffer from a debilitating injury of a particular duration; therefore, judgment in favor of the plaintiff was improper as to future lost earnings. *Brown*, 162 Ill. App. 3d at 938.

■ In the present case, however, plaintiff has been diagnosed with a chronic condition which has caused severe permanent limitations in the type of work he is able to perform. Plaintiff testified that he could have returned to work at the end of 1983, but that Caterpillar had not yet found an appropriate job for him, considering his limitations. Taking into account plaintiff's work restrictions as testified to by Dr. Vidinli, along with evidence of plaintiff's calculated past and present wages, it appears that plaintiff has established, with a fair degree of probability, a basis for assessment of lost past and future wages. As such, we find the jury's award of damages proper.

For the above reasons, we therefore affirm the judgment of the trial court.

Affirmed.

MANNING, P.J., and BUCKLEY, J., concur.