**PYRAMID SECURITIES LIMITED, Appellant,**

v.

**IB RESOLUTION, INC.**

No. 90–7010.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1990.

Decided Feb. 1, 1991.

Rehearing En Banc Denied March 25, 1991.

Michael J. McManus, with whom Warren Lutz and Michael S. Levine, Washington, D.C., were on the brief for appellant.

Sheila J. Carpenter, with whom Bruce R. Hegyi and Robert A. Spencer, Washington, D.C., were on the brief for appellee.

Before BUCKLEY, WILLIAMS and THOMAS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Pyramid Securities Ltd. brought suit in district court against International Bank, claiming that it was liable under RICO, the Racketeer Influenced and Corrupt Organizations statutes, 18 U.S.C. §§ 1961, 1962(c), (d),[1] and under the common law, for acts allegedly performed by its Cayman Islands subsidiary, Washington International Bank and Trust, Ltd. The district court granted summary judgment for the defendant, finding that the alleged acts did not satisfy RICO's requirement of a "pattern" of racketeering activities and that the statute of limitations had run on the common law claims. *Pyramid Securities v. International Bank*, 726 F.Supp. 1377 (D.D.C.1989). IB Resolution, Inc., successor of International Bank by merger, has been substituted as defendant in this court. We affirm.

I

Edward Attridge, a resident of the Cayman Islands, created Pyramid as a vehicle for handling his investments in securities and commodities. He is its president and sole owner. In 1980 he hired Washington International to perform bookkeeping and "clearinghouse" functions for Pyramid. The bookkeeping duties were assumed by Pyramid's accountants in the fall of 1980, but Washington International continued with the clearinghouse function—balancing Pyramid's accounts with various brokerage

---

**1.** Section 1962(c) reads: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

Section 1962(d) reads: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

firms by paying sums due for purchases and receiving sums due as a result of sales. For these services Washington International received a fee of ¼ of 1%. Nicholas Duggan, Washington International's President and at the time Attridge's personal friend, oversaw the bank's performance of its work for Pyramid.

In September 1980 Pyramid started using the brokerage services of one Linda Pearson and her employer, originally Paine Webber and later E.F. Hutton. Attridge evidently chose Pearson on the basis of statements by a Washington International employee that she offered a good discount and was used by some of the bank's other customers. Pearson traded on Pyramid's behalf through late August 1981, when Attridge decided that Pyramid would in the future pursue only low-risk, long-term investments, and directed her to stop her trading activities. A few days later, he flew to Hawaii to be married and to take a long honeymoon. Pearson came to the wedding, remained in Hawaii for about a week, and then returned. Attridge told her when he would get back to the Cayman Islands—late November.

The cat being away, Pearson could play. On her return from Hawaii she began "churning" the account—i.e., making a series of unauthorized trades that generated commissions for her—and thereby severely reduced the account's value. Although Pyramid's British Virgin Islands office evidently received confirmation slips for the trades, Attridge did not personally discover the churning until he returned from his honeymoon.

Pyramid sued Pearson and Hutton, but settled the suit in December 1985.[2] Throughout the Pyramid–Hutton litigation, Washington International employees testified that they were unaware of the September–November 1981 trades. It later became apparent, however, that at least a scrivener at the bank was aware of them, for in due course the parties discovered a record of them in a bank ledger book, which Pyramid has since branded the "secret ledger".

On December 31, 1987, Pyramid filed its complaint in the present litigation, suing International Bank for alleged wrongdoing by its subsidiary, Washington International. (We assume the validity of piercing the corporate veil; the issue was raised before the district court but not decided by it or briefed by the parties here.) Pyramid alleged that Washington International's involvement constituted complicity in the churning scheme and amounted to a "pattern of racketeering" under RICO that entitled Pyramid to treble damages. Pyramid also asserted related common law claims, including fraud, negligence, civil conspiracy, breach of contract, and breach of fiduciary duty.

After considerable discovery the defendant filed a motion to dismiss the complaint, which the court treated as one for summary judgment. See Fed.R.Civ.P. 56(c). The court granted the motion, finding that there was an insufficient "pattern" to sustain the RICO claims. Although finding no diversity of citizenship, it went on to treat the state law claims and found them time-barred.

## II

As the court granted summary judgment, we must decide whether a jury could reasonably have found for Pyramid on the record before the district court; although we must resolve all serious conflicts of evidence in Pyramid's favor, a mere scintilla in its favor is not enough to defeat the motion. See *Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1484–85 (D.C.Cir.1989). We start with the RICO claims.

A violation of RICO § 1962(c) consists of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d

---

**2.** The settlement was for $850,000 (before deduction for attorneys' fees and other expenses), and IB suggests that this wipes out any common law claim, as the Hutton recovery would be credited against Pyramid's damages. But the possibility of punitive damages draws this theory in question, and the point makes no difference in view of our disposition of the case.

346 (1985) (footnote omitted). Pyramid argues that International Bank (through its subsidiary Washington International), Duggan, Pearson, and Hutton had formed an enterprise (or "association-in-fact") for the legitimate trading of securities long before the events at issue in this case, and that this enterprise conducted "racketeering activity" in the form of securities fraud, mail fraud, wire fraud, and obstruction of justice.

As the district court threw out the RICO claims only for want of a *pattern* of racketeering, we assume that Washington International engaged in some acts of racketeering. The assumption is something of a strain, in view of the tenuous character of Pyramid's evidence. Granted, the testimony of Washington International employees that they did not receive records of the churning while it took place raises a question as to who kept the "secret ledger". If it was one of those witnesses, or if one of them knew of the record-keeping while it was going on, that witness obviously lied, suggesting a possible entanglement with Pearson that he or she wished to cover up. But any such mendacious concealment, if it occurred, is also consistent with a misbegotten effort to conceal negligence by the bank. The inference that Washington International bungled its handling of Pyramid *on purpose* appears a stretch—especially as nothing in the record suggests that it could have expected to profit from the churning; it could hardly have expected to collect a fee for any clearinghouse work performed in violation of Attridge's instructions, and in fact there is no claim that Pearson's churning presented any occasion for the sort of services it formerly provided.[3] In any event, we agree with the district court that any racketeering did not amount to a pattern.

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court set out limits on what could constitute a RICO pattern. Apart from the minimum of two predicate acts required by RICO's text, the plaintiff or prosecutor "must show that the racketeering predicates are related, *and that they amount to or pose a threat of continued criminal activity.*" 109 S.Ct. at 2900 (emphasis added).

In turn, the plaintiff can satisfy the "continuity" requirement by showing either a "closed period of repeated conduct, or ... past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902. Pyramid invokes both.

### A. A "closed-ended" period.

■ Where there is no threat of further racketeering, *H.J.* states that "acts extending over a few weeks or months" are not enough. 109 S.Ct. at 2902. Here the securities fraud lasted three months, from early September to late November 1981. Similarly, assuming that a conspiracy to violate securities fraud laws is also a predicate offense under RICO, see *United States v. Weisman*, 624 F.2d 1118, 1123–24 (2d Cir. 1980), any such conspiracy ended with the abandonment of the churning when Attridge returned to the Cayman Islands.

Pyramid apparently argues that Washington International extended the "conspiracy" through 1984 or 1985 by "concealing" its knowledge of (and alleged participation in) the churning. But the Supreme Court held long ago that a conspiracy generally ends when the design to commit substantive misconduct ends; it does not continue beyond that point "merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957). After-the-fact concealment "indicate[s] nothing more than that the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Id.* at 406, 77 S.Ct. at 974.

---

**3.** Pyramid may have raised its awkward RICO claims because Hutton has (arguably) already compensated it for most or all of its losses (see note 2 above). Under RICO it appears that the proceeds of prior judgments are set off against a recovery only *after* the trebling of damages. *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1310 (7th Cir.1987).

While *Grunewald* holds open the possibility that concealment could extend a conspiracy if the conspirators expressly plotted it in advance of the substantive crimes, it imposes an almost insurmountable evidentiary hurdle—"direct evidence [of] an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* at 404, 77 S.Ct. at 973; see also W. LaFave & A. Scott, Criminal Law § 6.5, at 557 (2d ed.1986) (proof "virtually impossible"). Pyramid has produced nothing resembling such evidence.

Pyramid also suggests that Washington International's alleged "concealment" itself involved RICO predicate acts besides conspiracy to commit securities fraud. But it points to no such act. Thus the theory provides Pyramid no real help, even assuming that concealment activities that cannot extend the duration of a conspiracy under *Grunewald* might nonetheless do so for a racketeering "pattern" under RICO.

Specifically, Pyramid argues that Washington International committed mail fraud (a RICO predicate act, see 18 U.S.C. § 1961(1)(B)) on March 3, 1982 when it sent Pearson a letter asking her for copies of "statements of the [Pyramid] account" and said it had not received any since June 30, 1981. See J.A. 662. Since Washington International obviously could not have meant to defraud Pearson, Pyramid ventures the suggestion that it sent the letter solely so that it could later give Pyramid a copy (as it later did, in response to a request from Attridge), thereby feigning innocence.

This claim is enormously creative. First, Pyramid's smoking gun—Washington International's "secret" ledger book—proves that someone at Washington International had received notice of the churning (perhaps in the form of confirmation slips), *not* that it had received "statements" of the

Pyramid account, a phrase presumably referring to brokers' conventional monthly statements. Pyramid has offered not a shred of evidence that the bank had received such statements, and thus no evidence that the March 3, 1982 letter could have been intended to advance a fraudulent scheme by lulling Pyramid into some false assumption. Second, even if the bank had received Pyramid's account statements, the natural explanation for the letter is bank sloppiness, not conspiracy. To suggest that Washington International wrote the letter in anticipation of Pyramid's later request, and thus the chance to fool Pyramid, smacks of the paranoid. Finally, we note that the letter was sent within six months of the start of the churning; that may or may not be enough to overcome *H.J.*'s statement rejecting "acts extending over a few weeks or months".[4] See 109 S.Ct. at 2902.

Pyramid further argues that Washington International committed mail fraud on October 21, 1983, when at Pyramid's request it mailed Pyramid copies of the bank's correspondence with Hutton, which Pyramid needed to pursue its Hutton litigation. Again Pyramid shows neither the falsity of the letters nor any other way in which the bank's response to Pyramid could plausibly be viewed as advancing a scheme to defraud. In any event, because the letter gives every evidence of having travelled only within the Cayman Islands, as Pyramid appears to concede, Appellant's Reply Br. 3 n. 3, it does not satisfy § 1341's requirement of use of the US mails. See, e.g., *U.S. v. Dray*, 901 F.2d 1132, 1135 (1st Cir.1990); *U.S. v. Wosepka*, 757 F.2d 1006, 1010 (9th Cir.1985).

Pyramid also charges that throughout its Hutton litigation, Washington International employees, including Duggan, lied in depositions about their first-hand knowledge of the churning. As perjury is not a predicate

---

**4.** When Attridge returned from his honeymoon, he had several conversations with an unidentified Washington International employee who said that the bank did not have "any" documents from Hutton (apparently referring to ones that would have evidenced the churning). J.A. 722–23. Pyramid claims that Washington

International thereby violated the wire fraud statute. See 18 U.S.C. §§ 1343, 1961(1)(B). As the alleged conversation occurred soon after Attridge's return, it would not extend the pattern of substantive crimes significantly beyond the original three months of churning.

offense under RICO, see, e.g., *U.S. v. Williams,* 874 F.2d 968, 973 n. 17 (5th Cir.1989), Pyramid argues that these statements, assuming them to be lies, constituted obstruction of justice by Washington International in violation of 18 U.S.C. § 1503. See also 18 U.S.C. § 1961(1)(B).

Pyramid merely cites § 1503, as though the bank employees' testimony were self-evidently a violation—and one by Washington International. Presumably Pyramid refers to the section's prohibition of attempts "to influence, obstruct, or impede, the due administration of justice". To constitute such a violation, the defendant must have acted with the "specific intent to impede the administration of justice", *Williams,* 874 F.2d at 980; see also *Melton v. City of Oklahoma,* 879 F.2d 706, 732 (10th Cir.), reh'g en banc granted on unrelated issues, 888 F.2d 724 (10th Cir.1989); *United States v. McComb,* 744 F.2d 555, 561 (7th Cir. 1984), and there must have been "a pending judicial proceeding [which the defendant] knew of and sought to influence, impede, or obstruct". *United States v. Capo,* 791 F.2d 1054, 1070 (2d Cir.1986), modified on rehearing in other respects, 817 F.2d 947 (2d Cir.1987) (en banc); see also *United States v. Smith,* 729 F.Supp. 1380, 1383 (D.D.C.1990) (citing cases).

It is hard to imagine that Washington International had the specific intent of obstructing justice in the only judicial proceeding "pending" at the time, the Pyramid–Hutton litigation, and Pyramid has not even made such a claim. Even if the employees' statements were conscious lies that could be imputed to Washington International, they could at most manifest a "specific intent" to prevent the birth of a possible future lawsuit against the bank. Accordingly, the § 1503 claim must fail.[5]

Finally, again on the premise that conspiracy to violate the securities fraud laws is a RICO predicate act, Pyramid may be invoking the doctrine that concealment activities can prolong a conspiracy if they make it easier to commit future substantive offenses or complete ongoing ones—as where kidnappers conceal their whereabouts while waiting for ransom. See *Grunewald,* 353 U.S. at 405, 77 S.Ct. at 974. But as we develop below in consideration of the theory of an "open-ended" pattern, Pyramid has failed to support its claim that Washington International ever plotted to participate in any criminal activity other than the churning that ended in November 1981 (assuming it did even that).

### B. Open-ended theory of continuity.

■ Pyramid argues that Washington International's activities posed a "threat of continued criminal activity". See *H.J.,* 109 S.Ct. at 2900. The Supreme Court has not defined the bounds of this "open-ended" pattern, but its illustrations indicate a requirement of far more than a hypothetical possibility of further predicate acts. One example is of a "hoodlum" who sells " 'insurance' to a neighborhood's storekeepers to cover them against breakage of their windows, telling his victims he would be reappearing each month to collect the 'premium' that would continue their 'coverage.' " *Id.* at 2902. The others are of "a long-term association that exists for criminal purposes", and of cases where the predicate acts "are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' " *Id.*

Pyramid suggests that Washington International entered into some sort of partnership with Hutton and Pearson to commit RICO acts as "a regular way of conducting [their] ongoing legitimate business." Its theory is that if Attridge had never discovered the churning, the bank would have continued to defraud both Pyramid—and others. But Pearson, the only person shown to have actively participated in the churning and apparently the only one

---

5. Pyramid also claims that there was something fraudulent about Washington International's failure, during the churning period, to charge commissions and produce standard trading documents. As the bank had no basis for charging commissions in the churning period, in light of the understanding with Attridge, we cannot see how its not doing so could prove anything. In any event, omissions during the too-short churning period cannot extend it.

with any financial incentive to do so, could not have expected to continue manipulating Pyramid's account after Attridge returned from his honeymoon in November 1981. Attridge himself testified that before his wedding he checked Pyramid's portfolio on a daily basis. Indeed, immediately upon his return, he checked his account and found that things had gone awry. J.A. 457 ("[T]he assistant read off a list of stocks, and right away I knew that those were not my stocks."). Only the long honeymoon gave Pearson her opportunity. Nor is there any merit in Pyramid's effort to discern a conspiracy to defraud others in Attridge's testimony that he "[knew] of Mr. Duggan being aware that there was [sic] problems with Pearson with other customers of the bank." J.A. 500. Attridge offered no clue either as to how he had acquired this supposed knowledge about Duggan's state of mind nor the nature of the "problems with Pearson", which could mean almost anything. If threats as ephemeral as this could meet the continuity requirement, the Court's entire discussion in *H.J.* would impose no minimum on the "pattern" required for RICO.

■ One more loose end: Pyramid asserts a violation of § 1962(d)'s prohibition of a conspiracy to violate § 1962(c). This claim falls with the § 1962(c) claim unless there is some evidence in the record that suggests a conspiracy to engage in racketeering acts that (but for detection) would have continued on after the churning scheme. As there is no such evidence, the claim must fail.

### III

After dismissing the RICO claims, the district court found that there was no diversity of citizenship to support jurisdiction over the common law claims. Without mentioning the possibility of pendent jurisdiction, it nonetheless went on to the claims' merits and dismissed them as time-barred. We find diversity of citizenship. We then go on to address a defense contention that the district court left unre-

solved—whether Washington International was a party required to be joined under Rule 19, Fed.R.Civ.P. We conclude it was not. Finally, on the merits we affirm the district court.

■ IB is incorporated in Arizona and has its principal place of business in the District of Columbia; it is thus a citizen of both for purposes of diversity. See 28 U.S.C. § 1332(c)(1). Because Pyramid is a citizen of neither, there is apparent diversity. Yet, relying on several decisions of the Fifth Circuit, see, e.g., *Freeman v. Northwest Acceptance Corp.*, 754 F.2d 553, 558 (5th Cir.1985), the district court attributed a third citizenship to IB, the Cayman Islands citizenship of its subsidiary Washington International. The court argued that imputing a subsidiary's citizenship to its parent is proper where the latter is the "alter ego" of the former and, as in this case, "the parent corporation is being sued solely for the acts of its completely controlled subsidiary." J.A. 904.

We reject this analysis. In the reverse context, addressing efforts to attribute a parent's citizenship to its subsidiary, the courts have treated the two as separate entities. *U.S.I. Properties Corp. v. M.D. Construction Co.*, 860 F.2d 1, 7 (1st Cir. 1988); *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir.1972). The statute suggests no attribution rule in either case. Nor are we persuaded by the district court's suggestion that because Pyramid's substantive claim involved piercing the corporate veil, consistency required the court to do so for purposes of determining diversity. In fact the district court's citizenship analysis is in some ways the reverse of veil-piercing, for it looks through the shareholder (parent corporation) and treats the corporation (subsidiary) as the controlling reality. Focusing on the subsidiary for jurisdictional purposes seems wholly anomalous where the substantive claim is about the parent and any remedy must come from the parent's pocket. That the parent's liability arises from acts of a subsidiary does not seem to weaken the traditional concern, however obsolete, that

home-state prejudice might unfairly jeopardize the "foreign" party.

■ The defendant argued before the district court, and has preserved the argument before us, that Washington International was an indispensable party. As both Pyramid and Washington International are citizens of the Cayman Islands, that conclusion would have defeated diversity and required the court to dismiss the state law claims.

There are two oddities about this argument. First, Washington International may no longer exist as a discrete corporate entity. IB sold it during the course of the lawsuit and, according to Pyramid's papers before the district court, it was about to be merged into a new corporation. See J.A. 622; but see J.A. 848. Second, although IB asserts indispensability only as to the state law claims, where the upshot would be loss of jurisdiction, there appears no reason to think that Washington International would be any less indispensable as to the RICO claims. If we adopted IB's argument, we might have needed to remand the entire case to the district court—federal claims and all—for joinder of Washington International or its successor.

Luckily, Washington International is not indispensable at all. IB does not identify a single plausible way in which proceeding without Washington International would prejudice anyone or impinge on any of the concerns that are relevant under Rule 19. Instead, IB proposes a per se rule that a subsidiary is *always* an indispensable party in a suit against its parent if the subsidiary "is not just an important witness or source of evidence, but is in fact the primary participant in the actions complained of." Appellee's Br. at 39–40. IB makes no effort to connect this theory to the language of Rule 19. The only appellate opinion it cites for so broad a principle is *Freeman,* which similarly rested indispensability only on the "primary participant" theory, 754 F.2d at 559, with no review of Rule 19's checklist of possible risks of non-joinder.

Before the district court IB did mention two possible adverse effects of non-joinder. First, it argued that because Pyramid's allegations have jeopardized Washington International's reputation, the case "should be tried in the Cayman Islands where [Washington International] can clear its name." J.A. 329. The notion that parties must be joined merely because of the risk to their reputation is staggering. Without exploring its full implications, we simply note that it would scuttle the established principles that one joint tortfeasor is generally not an indispensable party in a lawsuit against another, see J.W. Moore, Moore's Federal Practice § 19.12, at 19–216 & n. 20 (2d ed. 1985), and, more specifically, that agents are not indispensable parties in suits against the principal (at least where the principal was disclosed), *id.* at 19–219, citing *Milligan v. Anderson,* 522 F.2d 1202, 1204–05 (10th Cir.1975).

IB also argued to the district court that non-joinder would enable Pyramid to bring a later, virtually identical suit against Washington International. Because IB signed an indemnity agreement with Washington International's purchaser, IB would have to pay both the costs of such a suit and any judgment levied against Washington International. Of course, this assurance that IB would bear the ultimate loss only replicates the outcome prevailing if Washington International had continued as IB's subsidiary—it would then have borne the loss as sole shareholder.

We examine the issue of prejudice to IB from the perspective of the parties at the outset of this suit—i.e., without glancing sidelong at the outcome on the merits. See *Tankersley v. Albright,* 514 F.2d 956, 965–66 & n. 21 (7th Cir.1975); but cf. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110–11, 88 S.Ct. 733, 738–39, 19 L.Ed.2d 936 (1968) (appellate courts may sometimes take outcome on merits into account); *Bourdieu v. Pacific Western Oil Co.,* 299 U.S. 65, 71, 57 S.Ct. 51, 53, 81 L.Ed. 42 (1936) (where complaint fails to state cause of action, consideration of parties' indispensability is "a vain waste of time"). Courts appear to have regarded the ex post analysis as suitable only where the party raises the issue for the first time after judgment. See, e.g., *Fetzer v. Cities*

*Service Oil Co.*, 572 F.2d 1250, 1253–54 n. 6 (8th Cir.1978); cf. *Compania Trasatlantica Espanola, S.A. v. Melendez Torres,* 358 F.2d 209, 214 (1st Cir.1966). See generally C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1609 (2d ed. 1986). From an ex ante perspective, the possible injuries to IB from non-joinder fall into two categories, corresponding to the twin possibilities that IB would lose this lawsuit or win it.

First, IB might have feared that if it lost this suit it would ultimately have to pay two judgments on the same claim. But that result is inconsistent with the general common law principle (presumably applicable in the Cayman Islands) that a plaintiff can collect only once for a single injury. See Prosser & Keeton on Torts § 48, at 331 (5th lawyer's ed. 1984) ("When payment of the judgment in full is made by the judgment debtor, there is no doubt that the plaintiff is barred from a further action against another who is liable for the same damages...."); 2 Restatement (2d) of Judgments § 50, at 40–47 (1982); 4 Restatement (2d) of Torts §§ 885–86, at 333–37 (1979); see also *FSLIC v. Reeves,* 816 F.2d 130, 135–37 (4th Cir.1987).

Second, if IB won this suit, it would be exposed to the risk of paying for two defenses on the same claim, first here, then in a suit against Washington International. One answer lies in the possibility of defensive use of collateral estoppel, despite the want of "mutuality", though we do not know the status of that doctrine in the Cayman Islands. Compare *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971); 1 Restatement (2d) of Judgments § 29, at 291–303 (1982). Further, it may well be that by the time IB raised the Rule 19 issue the statute of limitations had run in every jurisdiction where Pyramid could have reached Washington International. In any event, such risks of double *litigation* will be posed in any case where a party is liable both directly and indirectly—either as owner or indemnitor of a potential second defendant. Without more, they seem too remote to sustain IB's claim of indispensabili-

ty. Compare J. Moore, § 19.07–2[1], at 19–140–42 & n. 13 (noting that Rule 19(a) requires a "substantial risk of incurring double, multiple, or otherwise inconsistent obligations" and that therefore "mere theoretical possibilities" of inconsistent obligations are not enough for indispensability under Rule 19(b)).

■ On the merits of the statute of limitations defense, the parties have agreed that a three-year statute governs, running (at the latest) from the time Pyramid should have known of the claims. See D.C. Code Ann. §§ 12–301(7) (for breach of contract); 12–301(8) (for breach of fiduciary duty, negligence, civil conspiracy, and fraud). Pyramid filed suit on December 31, 1987. Thus, the claims are barred if the district court was correct that a reasonable jury would necessarily find that Pyramid should have known of them by November 1984. We agree with the district court that the time has run.

The critical issue is when Pyramid received the ledger in which someone at Washington International hand-recorded the trades made in Pyramid's Hutton account in the autumn of 1981. It is undisputed that transfer of the ledger occurred in the context of Pyramid's suit against Hutton. Attridge himself has already taken an unequivocal position that his lawyer received the ledger in November 1984.

In a suit filed in Florida in 1987 by Pyramid, against the banks (Washington International and International Bank) and against the lawyers who represented Pyramid in its suit against Hutton, Pyramid claimed that its own lawyers mishandled the prior suit. Specifically, it claimed that Karen Gievers received the ledger in November 1984:

> On or about November 14, 1984, during the course of conducting discovery in preparation for the trial of PYRAMID's law suits, GIEVERS received from the BANK a secret securities ledger that revealed for the first time that ... the BANK had received on a timely basis notification of each and every unauthorized trade of PYRAMID's property.

GIEVERS failed to recognize, appreciate and understand the significance of this secret securities ledger to the litigation entrusted to her care.

J.A. 365–66.

Contradictory pleadings do not usually create a judicial estoppel unless the party prevailed on the repudiated pleading. See *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547–48 (7th Cir.1990). But Attridge backed Pyramid's pleading up with his own affidavit, signed June 29, 1987, swearing:

> It was from that securities mail register, which was first produced in November of <u>1984</u>, that I learned WASHINGTON had, in fact, received on a timely basis the confirmations or invoices for each of the unauthorized trades in and out of PYRA-MID's account.

J.A. 104 (emphasis in original). The Florida pleadings do not make clear whether Attridge thought the date November 1984 helped his case because it was early (suggesting Gievers's sloth thereafter) or because it was late (emphasizing either the banks' concealment of the ledger or Gievers's sloth in securing it). But his underlining the year 1984 surely reflects intense focus on the issue. As Gievers was Pyramid's agent, her knowledge is imputed to Pyramid. Thus, if Attridge's sworn statement in the Florida lawsuit is accurate, Pyramid's state law claims here are barred.

Pyramid now claims that neither it nor its agents received the ledger until December 1985. In retrospect, Attridge wonders whether he had sufficient knowledge of the facts to make the sworn allegation found in his affidavit. But Attridge's expedient doubts about the veracity of his own past sworn statement do not raise a genuine issue of material fact. Where a party emphatically and wittingly swears to a fact, it bears a heavy burden—even in the summary judgment context—when it seeks to jettison its sworn statement.

Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony. See, e.g., *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975–76 (4th Cir. 1990); *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129, 1131–32 (6th Cir. 1989); *Adelman–Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 520–21 (7th Cir. 1988); *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir.1988) (citing cases); *Van T. Junkins and Associates v. United States Industries*, 736 F.2d 656, 657 (11th Cir.1984); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 544 (9th Cir.1975); *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969); *Kizas v. Webster*, 492 F.Supp. 1135, 1147 n. 42 (D.D.C.1980), *rev'd on other grounds*, 707 F.2d 524 (D.C.Cir. 1983). "[T]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard [the later testimony]." *Martin*, 851 F.2d at 706. Some courts have extended the doctrine to cover even a non-party witness brought forward to advance the party's case, see, e.g., *Adelman–Tremblay*, 859 F.2d at 521, but where as here the affiant is the sole shareholder and president of the plaintiff corporation, we need not reach that extension. The upshot is that the prior sworn statement will receive controlling weight unless the shifting party can offer persuasive reasons for believing the supposed correction. E.g., *Farrell*, 870 F.2d at 1131–32.

Such reasons are more likely to be available where the initial statement took the form of a deposition rather than (as here) an affidavit. A deponent may have been confused about what was being asked or have lacked immediate access to material documents. See, e.g., *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). As affidavits are prepared at the affiant's own initiative, these excuses are typically inapplicable. A party can also support repudiation of an earlier statement by offering newly discovered evidence. See, e.g, *Adelman–Tremblay*, 859 F.2d at 520.

In this case, Pyramid offers two points to support its repudiation, neither of which amounts to new evidence or materially undermines the original assertion. First, Pyramid observes that at a deposition in November 1984 Gievers stated that Washing-

ton International was withholding the ledger at the instruction of its lawyers. As Attridge was present when Gievers made the statement, he obviously knew about it when he signed his affidavit two and a half years later. Besides, it is easily reconciled with Attridge's affidavit, as the bank could well have relented soon after.

Second, Pyramid points to an affidavit and deposition by Attridge—both made after International Bank had raised the statute of limitations defense—saying that his first exposure to the ledger came in December 1985, when (according to him) an embarrassed Duggan called him in at the tail end of a new deposition and conceded that the ledger contained damning evidence about Washington International. The new account, though vivid, does nothing to suggest any of the sort of new evidence, confusion, or lack of access to facts that have been taken to justify denying summary judgment on the basis of a repudiation. It certainly offers no reason to think Attridge's memories of his exchange with Duggan should now be sharper than when he filed the Florida affidavit in June 1987.

Moreover, Attridge's current account of Duggan's disclosure at the time of the December 1985 deposition with Duggan is in fact consistent with his earlier affidavit. That Duggan himself was either unaware of the ledger until December 1985, or slow to see its potential significance, does not imply that Pyramid had not received it before. In fact, Duggan's knowledge or anxiety that Pyramid's lawyers had copies of the ledger could have played a role in his readiness to come forward with it at the 1985 deposition.

If the issue were purely one of probabilities, Pyramid's evidence might be enough to sneak past summary judgment. But the cases resting summary judgment on sworn but repudiated party assertions reflect both a judicial insistence that parties proceed with real care in their supporting affidavits or testimony and a belief that parties' opportunism should not readily imperil summary judgment. We agree, and do not believe that Pyramid has undermined Attridge's 1987 affidavit enough to raise a material issue on the date of Pyramid's notice of its potential claims.

As we agree with the district court that the facts cannot establish a pattern of racketeering for RICO purposes and that the state law claims are time barred, we affirm.

*So ordered.*